This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant ("Mother")[1] appeals from an order of the Summit County Court of Common Pleas, Juvenile Division, that permanently terminated her parental rights to her child and placed her in the permanent custody of Summit County Children Services Board ("CSB"). We affirm.
 {¶ 2} Mother has one child, J.J., a girl, born December 9, 1993. J.J. and Mother both have velocardiofacial syndrome, a rare disorder that can cause a variety of physical and mental abnormalities. As a result of the disorder, J.J. has experienced problems that include abnormal bone growth, developmental delays, speech problems, and she has required surgeries to correct club feet and to repair an opening in the roof of her mouth.
 {¶ 3} Mother and J.J. have a long history with CSB. They first became involved with the agency on a voluntary basis when J.J. was one year old. CSB's concerns at that time were J.J.'s medical and developmental problems and Mother's expression of suicidal statements. That case was eventually closed because CBS put community services in place to assist Mother in caring for J.J. An involuntary case was later opened, with CSB expressing the same concerns. That case was also eventually closed.
 {¶ 4} Mother worked with the same CSB caseworker throughout this time and also worked with the same medical conservator for five years. Both of these individuals, as well as other professionals, were of the opinion that Mother needed the help of a variety of service providers to meet the basic needs of J.J. Mother had a long history, however, of failing to work with the service providers. Mother's confrontational behavior had alienated several service providers, including several agencies and one pediatrician, to the point that they refused to work with this family.
 {¶ 5} This case began when J.J. was taken into emergency temporary custody of CSB in July 2001. CSB moved for permanent custody of J.J. on May 1, 2002. Following a hearing, the trial court terminated Mother's parental rights and placed J.J. in the permanent custody of CSB. Mother appeals and raises five assignments of error.
 ASSIGNMENT OF ERROR I {¶ 6} "The trial court erred to the prejudice of Appellant when it determined that it was in the best interest of the minor child to be placed in the permanent custody of CSB[.]"
 ASSIGNMENT OF ERROR II {¶ 7} "The trial court erred to the prejudice of Appellant when it granted CSB's motion for permanent custody thereby terminating the parental rights of Appellant [Mother] as the trial court's findings are against the manifest weight of the evidence[.]"
 {¶ 8} Because Mother argued the first two assignments of error jointly, we will address them together. She contends that the trial court erred in granting CSB's motion for permanent custody of J.J.
 {¶ 9} Termination of parental rights is an alternative of last resort, but is sanctioned when necessary for the welfare of a child. Inre Wise (1994), 96 Ohio App.3d 619, 624. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, who is not abandoned or orphaned, it must find by clear and convincing evidence that (1) either (a) the child has been in the temporary custody of the agency for at least twelve months of the prior twenty-two months period, or (b) the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2). Mother concedes that there was ample evidence before the trial court on the first prong of the test. She contends, however, that there was not clear and convincing evidence before the court to establish that permanent custody to CSB was in the best interest of J.J.
 {¶ 10} To satisfy the best interest prong of the permanent custody test, CSB was required to establish, by clear and convincing evidence, that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C.2151.414(B)(1). See, also, In re William S. (1996), 75 Ohio St.3d 95,97-98. When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must:
 {¶ 11} "[C]onsider all relevant factors, including, but not limited to, the following:
 {¶ 12} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 13} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 14} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
 {¶ 15} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)-(4)[2]
 {¶ 16} The interaction between Mother and J.J. was described by Mother's medical conservator, who had the opportunity to observe Mother and J.J. over a five-year period, as being "like two children interacting. There's no parent and child. *** I'm not sure who is taking care of who, and that concerns me[.]" Several witnesses explained that Mother did not set appropriate limits for J.J. and did not make appropriate choices for her. Although Mother attended visits on a regular basis, her focus during the visits was frequently on criticizing the way J.J. was being cared for by complaining about the way her hair was done, what she was wearing, etc.
 {¶ 17} There was undisputed evidence at the hearing that Mother and J.J. seem to be happy to see each other at visits and that there is a bond between them. The focus of CSB's concern in this case was on Mother's inability to meet the basic needs of J.J. and the fact that she continually interfered with the professionals who provided services to J.J.
 {¶ 18} J.J. is a child with special needs. She must be educated in a special education setting and requires intensive speech therapy. As one witness explained, for J.J. to learn and progress in these areas, there must be good communication between home and school to reinforce the skills that J.J. is learning. J.J. also has special physical needs that require ongoing medical attention.
 {¶ 19} Several witnesses, two of whom had worked with Mother and J.J. for the past several years, testified that Mother, who has a low I.Q., does not have the ability to care for J.J. without assistance. In fact, Mother's own witness, her psychologist, testified that Mother would not be able to provide day-to-day care for J.J. without assistance. She has taken several parenting classes and is able to memorize information but she has demonstrated time and again an inability to apply what she has learned. For example, Mother once took J.J. to the doctor, but then failed to follow through with any of the treatment recommended by the doctor.
 {¶ 20} Consequently, Mother required the assistance of service providers to assist her in meeting J.J.'s many needs. During the several years preceding the permanent custody hearing, Mother had the opportunity to work with the same caseworker, who specialized in helping special needs children, and her medical conservator, who was an attorney as well as a former public health nurse. Each of these witnesses, as well as others, testified in detail about Mother's inability to work with service providers.
 {¶ 21} Witness after witness explained how Mother interfered with the work of the service providers. As one witness described, she would "create a lot of chaos among the professionals that she deals with." Her interference usually included repetitive phone calls, with some providers reporting that she would call numerous times during the day, sometimes even several times in one hour. The supervisor of Mother's caseworker explained that Mother's phone calls to him usually were unproductive. Mother was clearly angry when she called, would speak to him in a high-pitched voice, and would often swear at him. During the phone calls to that witness and several other service providers, and even when she saw some providers in person, Mother typically questioned what they were doing, made accusations that the providers did not know what they were doing, became verbally abusive and overly emotional, accused many of them of telling lies about her, and even threatened some of them.
 {¶ 22} Mother's confrontational attitude toward service providers had alienated many providers to the point that they refused to work with her. Mother's medical conservator, along with several other witnesses who testified, knew that J.J. could not return to the home unless Mother had some help in her home. The conservator contacted six or seven different providers, however, and discovered that Mother had already worked with them and, because of Mother's behavior, they refused to work with her again. Based on her five-year experience with Mother, her medical conservator opined that Mother cannot maintain a positive relationship with a service provider.
 {¶ 23} Mother's caseworker testified that, during a one-year period, she put over twelve service providers in place for this family. The caseworker expressed concern that Mother had alienated so many service providers that she was left with virtually no support. According to the caseworker, during the several years that she had worked with her, Mother had made little change in the way that she interacts with professionals, interacts with J.J., or in her understanding of what is expected of a parent.
 {¶ 24} The guardian ad litem expressed her opinion that a placement outside Mother's home would be best for J.J. She shared the opinion of many of the professionals who testified that Mother's resistance to help prevents her from being able to effectively parent J.J. in the past, present, or future.
 {¶ 25} J.J. has spent approximately half of her life outside of her Mother's custody. Witness after witness gave examples of how J.J. flourished while outside her mother's custody and redeveloped problems each time she was back in her mother's custody. While J.J. was living with her Mother, she frequently missed school, was unable to independently bathe or dress herself, could not use silverware properly, and could not tie her shoes. Since entering her current foster home, J.J. has missed very little school and has become far more independent. She bathes and dresses herself and ties her own shoes.
 {¶ 26} Although no one directly blamed Mother for these problems, there was evidence that J.J. has experienced eating disorders and has become withdrawn at times, and those problems seem to develop while she is with her mother. For example, during J.J.'s two hospital stays following the surgery on her mouth, while Mother was constantly around, J.J. was not eating, nor was she interacting with any of the other children. This was a concern to the hospital staff. After Mother's visitation was limited, J.J. began eating and playing with other children.
 {¶ 27} During J.J.'s second hospital stay, Mother's visitation was cut off completely because J.J. "had developed an eating disorder so severe that she was starving herself to the point where doctors were thinking about putting in a feeding tube[.]" Consequently, the medical conservator made the decision to cut off Mother's visitation so that J.J. could have the opportunity to get better, which she did.
 {¶ 28} J.J. has special needs and will continue to have them. Several witnesses testified that Mother interferes with J.J.'s treatment and growth and, unless her access to the child is limited or cut off, she will continue to do so. The trial court had before it ample evidence that permanent custody to CSB was in the best interest of J.J. The first and second assignments of error are overruled.
 ASSIGNMENT OF ERROR III {¶ 29} "The trial court erred to the prejudice of Appellant when it denied Appellant's request to allow both guardian ad litems to testify[.]"
 {¶ 30} Mother challenges the trial court's refusal to allow the testimony of a prior guardian ad litem in this case. Mother's only legal argument is that the testimony of the prior guardian ad litem would have been relevant to the trial court's best interest determination. Mother proffered only that the testimony of the prior guardian ad litem "would have been as to the relationship of the mother and child in the early part of the case, plus some issues with CSB."
 {¶ 31} It is impossible to determine from this proffer, and Mother fails to even articulate in her appellate brief, how the testimony of the prior guardian ad litem would have differed from the testimony of the current guardian ad litem who did testify at the hearing. Thus, even if Mother could establish error, absent any showing of prejudice, we cannot find reversible error. See In the Matter of Estate of Kordiac (Oct. 20, 1999), 9th Dist. No. 19192. The third assignment of error is overruled.
 ASSIGNMENT OF ERROR IV {¶ 32} "The trial court erred to the prejudice of Appellant when it allowed the conservator for both mother and child to testify as to the child's best interest which is a conflict of interest[.]"
 {¶ 33} Mother contends that the trial court erred in allowing the testimony of the individual who had been appointed, pursuant to R.C.2111.021, as a conservator to "make medical and health care decisions for [Mother], and all medical, health care, and social, psychological and visitation decisions for her minor daughter, [J.J.]." Mother contends that, because the conservator represented both J.J. and Mother, she had a conflict of interest and should not have been allowed to testify. Mother cites no authority, however, to support her argument.
 {¶ 34} Mother makes a brief argument about the conservator's statutory duty to her. The existence of any statutory duty on the part of the conservator existed when she was acting in that capacity, when making medical or other decisions on behalf of Mother or J.J. She was not performing that role when she testified as a witness at the permanent custody hearing. Mother essentially attempts to argue that the conservator's testimony was privileged, as in the case of a health care provider or member of the clergy, but she has no statutory privilege to point to. As she has failed to establish any merit to this argument, the fourth assignment of error is overruled.
 ASSIGNMENT OF ERROR V {¶ 35} "The trial court erred to the prejudice of Appellant when it granted CSB's motion for permanent custody rather than granting legal custody to the Huthmakers[.]"
 {¶ 36} Finally, Mother contends that the trial court erred by failing to place J.J. in the legal custody of a third party, a friend of Mother's. This Court has held that a parent has standing to challenge the trial court's failure to grant a motion for legal custody filed by a non-parent because the court's denial of that motion led to a grant of permanent custody to the children services agency, which impacted the residual rights of the parent. See In re Evans (Feb. 2, 2000), 9th Dist. No. 19489, at 5. The parent has standing to challenge only how the court's decision impacted the parent's rights, however, not the rights of the third party. See id. In other words, Mother has no standing to assert that the court abused its discretion by failing to grant her friend legal custody of J.J. Her challenge is limited to whether the court's decision to terminate her parental rights was proper. See id.
 {¶ 37} Because Mother makes no new legal argument that the trial court's permanent custody decision was erroneous, and we have overruled her arguments under her first two assignments of error that did articulate such challenges, the fifth assignment of error is overruled.
 {¶ 38} The assignments of error are overruled and the judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
BAIRD and CARR, JJ., concur.
 {¶ 39} The Court finds that there were reasonable grounds for this appeal.
 {¶ 40} We order that a special mandate issue out of this Court, directing the , County of , State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
 {¶ 41} Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
BAIRD, J. and CARR, J., concur.
[1] Appellant has not been named to protect the identity of her child.
[2] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.